David **LINDER**, et al., Appellants,

v.

**NATIONAL SECURITY
AGENCY, Appellee.**

No. 95–5291.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 1996.

Decided Sept. 6, 1996.

**694**

Jennifer M. Green, with whom Michael Ratner, Jules L. Lobel, Pittsburgh, PA, Beth Stephens, Harold H. Koh, New Haven, CT, and Adam Steinman were on the briefs, argued the cause for appellants.

W. Mark Nebeker, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on the brief, argued the cause for appellee.

Before EDWARDS, Chief Judge, SENTELLE, Circuit Judge, and BUCKLEY,* Senior Circuit Judge.

Opinion for the court filed by Senior Circuit Judge BUCKLEY.

BUCKLEY, Senior Circuit Judge:

Appellants ask us to reverse a district court order granting the National Security Agency's motion to quash their third-party subpoena *duces tecum.* Based on the agency's examination of a representative sample of the requested documents, the court had concluded that virtually all of them were privileged and that compliance with the subpoena would have been unduly burdensome. Because the agency's claim of privilege was valid and its sampling of the documents properly conducted, we hold that the court's grant of the motion was not an abuse of discretion.

## I. BACKGROUND

Members of the Linder family ("Linders") have brought a wrongful death action in Florida against certain individuals whom the Linders allege to be responsible, through involvement with three Nicaraguan counter-revolutionary organizations (collectively, "contras"), for the 1987 torture and murder of their son and brother, Benjamin Linder. As part of discovery, the Linders served third-party subpoenas *duces tecum* on several U.S. government agencies, including the National Security Agency ("NSA"), seeking information that would help establish their claims in the underlying lawsuit.

NSA is a separate agency within the Department of Defense that is engaged in the conduct of signals intelligence ("SIGINT") activities, including the surreptitious interception of international communications. *See Founding Church of Scientology of Washington, D.C. v. NSA,* 610 F.2d 824, 825 (D.C.Cir. 1979). Information that NSA determines to be foreign intelligence of importance to the national defense, security, and foreign affairs of the United States is published in classified "SIGINT reports." During the 1980s, NSA prepared numerous SIGINT reports on the Nicaraguan Civil War and the contras.

The subpoena served on NSA listed fifteen categories of documents and essentially

* At the time of oral argument, Judge Buckley was a circuit judge in active service. He assumed senior status on September 1, 1996.

asked for all information concerning the contras and certain named individuals for the period between January 1, 1984, and January 1, 1989, as well as all information concerning human rights abuses attributed to the contras at any time. In a letter dated October 18, 1993, NSA informed the Linders that it objected to the subpoena on the grounds that the requested information was privileged and that compliance with the subpoena would be unduly burdensome. The Linders thereupon filed a motion in the district court to compel production of the documents sought by the subpoena.

In support of its opposition to the Linders' motion to compel, NSA submitted a declaration by its Director of Policy, Michael A. Smith ("Smith Declaration"). While Mr. Smith acknowledged that "NSA ha[d] thousands of intelligence reports that relate[d] to the contras that [were] potentially responsive to [the Linders'] requests," Smith Declaration ¶ 7, he stated that, based on a sample search, virtually all of them "relate[d] to core functions and activities of NSA," *id.* ¶ 3, and that they were protected from mandatory disclosure by various statutory and common law privileges, including section 6 of the National Security Act of 1959, Pub.L. No. 86–36, *quoted in* 50 U.S.C. § 402 *note* ("section 6"). *Id.* ¶¶ 3–4. He concluded that "[r]equiring NSA to collect and review each of these documents page by page ... would constitute a futile exercise that would unduly burden NSA's human and computer resources." Smith Declaration ¶ 10.

On August 2, 1994, U.S. District Judge Stanley S. Harris found that, while it was "readily apparent ... that the subpoena[ ] impose[d] a substantial burden on the ... NSA, ... [and that] much of the type of information sought is likely to be classified or privileged," NSA's claim that it would be unduly burdened required greater documentation. *Linder v. Calero–Portocarrero,* Misc. No. 94–148, Memorandum Order dated August 2, 1994 at 4–5 ("August 2, 1994 Order"). Judge Harris then set forth four categories of information he would require of the agency in support of a "claim of undue burden ... based on the difficulty and expense of reviewing 'voluminous files containing poten-

tially privileged [or classified] information.' " *Id.* at 5 (quoting *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 405 (D.C.Cir.1984)).

On October 14, 1994, the Linders served a revised subpoena, which NSA moved to quash in its entirety. Attached to the motion was a second declaration by Mr. Smith ("Supplemental Smith Declaration"), in which he affirmed that the agency had conducted an analysis of a sample of the requested documents search in accordance with the court's instructions. On June 28, 1995, the district court granted NSA's motion to quash, stating that

> [b]ecause NSA has adequately demonstrated that approximately 95% of the responsive documents would be privileged [under section 6], the Court finds that it would be unduly burdensome to enforce the subpoena *duces tecum.*

*Linder v. Calero–Portocarrero,* Misc. No. 94–148, Order dated June 28, 1995 at 2 ("June 28, 1995 Order"). The Linders challenge this order on the grounds that the district court incorrectly applied section 6 to their subpoena request, that the court failed to balance their need for the information against the Government's need for secrecy, that the proper procedures for asserting the section 6 privilege were not followed, and that the court failed to consider less drastic alternatives to quashing.

## II. ANALYSIS

■ A district court is authorized to quash or modify a subpoena if it "subjects a person to undue burden." Fed.R.Civ.P. 45(c)(3)(A)(iv). The court has broad discretion in determining whether a subpoena is unduly burdensome, and a decision to quash will be reversed only if it is "clearly unreasonable, arbitrary or fanciful." *Northrop,* 751 F.2d at 399 (citation omitted).

■ Here, Judge Harris quashed the subpoena because he found that compliance would prove excessively burdensome in light of his finding that the overwhelming majority of responsive documents were privileged under section 6. That section provides, in relevant part:

[N]othing in this Act or any other law ... shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of the persons employed by such agency.

National Security Act of 1959, Pub.L. No. 86–36, § 6, 73 Stat. 63, 64, *quoted in* 50 U.S.C. § 402 *note.*

The Linders argue that while section 6 does not require disclosure of information, it nowhere prohibits it. They also maintain that the section's legislative history reveals that the primary purpose of the statute was to protect NSA from having to report personnel data to the Civil Service Commission and that it was never intended to be used to bar judicial discovery.

■ The arguments based on legislative history are trumped by the plain language of the statute, which states unequivocally that "nothing in this *Act or any other law* ... shall be construed to require the disclosure of ... any information with respect to the activities" of the NSA. *See Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994) ("we do not resort to legislative history to cloud a statutory text that is clear"). Whatever concerns Congress may have had with the disclosure of personnel information to the Civil Service Commission, it chose statutory language that cannot be confined to so narrow a purpose; and the explicit reference to "any other law" (which surely includes laws governing civil discovery) must be construed to prohibit the disclosure of information relating to NSA's functions and activities as well as its personnel.

There can be no doubt that the disclosure of SIGINT reports would reveal information concerning the activities of the agency. As we stated in *Hayden v. NSA,* 608 F.2d 1381 (D.C.Cir.1979), "signals intelligence is one of [NSA's] primary functions"; and the release of the reports would "disclose information with respect to [NSA] activities, since any information about an intercepted communication concerns an NSA activity." *Id.* at 1389.

Moreover, the two affidavits submitted by Mr. Smith amply support the district court's conclusion that "disclosure of the requested materials could reveal the nature of that activity." *Id.* at 1391. As Mr. Smith explained:

NSA's SIGINT mission is to intercept foreign communications to obtain foreign intelligence information necessary to the national defense, national security, and foreign affairs of the United States.

[ ] A fundamental tenet of the SIGINT process is that the identity of SIGINT targets, the degree of success in exploiting those targets, the vulnerability of particular foreign communications, the ability to process large masses of information, and the extent of any analytic successes are all matters that must be maintained in the strictest secrecy. Disclosure of any of this information could encourage countermeasures to prevent interception of communications, with the likely result that the United States would be denied valuable intelligence.

Smith Declaration ¶¶ 5–6.

Contrary to what the Linders suggest, NSA was not required to provide any information as to the particular security threats posed by the release of the documents. We noted in *Hayden* that "[a] specific showing of potential harm to national security ... is irrelevant to the language of [section 6]. Congress has already ... decided that disclosure of NSA activities is potentially harmful." 608 F.2d at 1390. Thus, we need not consider the Linders' contention that because the *original targets of the SIGINT reports no longer exist,* the threat to national security posed by the release of the documents has disappeared. It seems obvious, however, that their disclosure could reveal information about NSA's capabilities and techniques that could be used by foreign governments to the detriment of U.S. national security interests in Central America or elsewhere.

■ The Linders' insistence that the district court should have examined the sampled documents *in camera* before ruling on the motion to quash is equally meritless. A court may rely on affidavits in lieu of an *in camera* review when they are sufficiently

detailed, as they were in this case. *See id.* at 1387 ("When the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate.").

The Linders also challenge the court's grant of the motion to quash on the ground that NSA has failed to follow the proper procedures for claiming the privilege granted in section 6. They contend, for example, that NSA failed to provide sufficient information with respect to the sampling of its records and that NSA should have submitted a *Vaughn* index of the sampled documents. *See Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C.Cir.1973). We disagree on both counts.

■ The district court took special care to ensure that the agency satisfied the criteria outlined in *Northrop Corp.*, 751 F.2d at 405–06. To this end, the court asked NSA to provide it with the following information concerning its search:

(1) information regarding how the sample is representative of the sources which are likely to include responsive information;

(2) what percentage of the documents is likely to be classified or privileged;

(3) information demonstrating that the percentage of potentially privileged documents in the sample can be expected to represent the percentage in the underlying universe of documents; and

(4) an estimate of the time and labor involved in complying with the subpoena and the basis of these estimates.

August 2, 1994 Order at 5.

In response to the first request for information, Mr. Smith noted, in his supplemental declaration, that while NSA possessed three categories of responsive documents: its own SIGINT reports, classified materials produced by other federal agencies, and press accounts relating to the contras, Supplemental Smith Declaration ¶¶ 11–12, the SIGINT reports represented over 90 percent of the total. *Id.* ¶ 8. Accordingly, "[i]n order to assure that [its] sampling would be broadly representative" of the Linders' concerns, and because Benjamin Linder's death was at the heart of their lawsuit, NSA retrieved SIGINT reports containing names listed in their request for information relating to twelve individuals who had allegedly participated in his murder. *Id.* ¶ 9.

In responding to the court's second and third requests, Mr. Smith affirmed that over 95 percent of the responsive documents in NSA's possession would be classified and covered by statutory privileges protecting the SIGINT reports and the classified documents generated by other federal agencies, the remainder consisting of press releases that were already in the public domain, *id.* ¶¶ 10, 13; and because virtually all of the responsive documents in the sample (other than the press clippings) were classified and privileged, the same was likely to be true of the underlying universe of documents, *id.* ¶ 13. As for the time and labor that would be involved in complying with the subpoena, he estimated that it would take at least 945 man-hours to do so, provided the court with a break down of how those hours would be spent, and noted that the task would divert use of NSA's computer database for a significant period during which it would be unavailable for other purposes. *Id.* ¶¶ 14, 14(a). The district court was satisfied with these responses, as are we.

■ To proceed to the Linders' second objection, NSA was under no obligation to submit a *Vaughn* index for the sampled documents. Given the nature of the agency's operations, we have found that a *Vaughn* index of SIGINT reports could cause the very harm that section 6 was intended to prevent:

In most … cases, a public *Vaughn* itemization does not compromise secrecy, because the contents of the requested documents are not thereby disclosed, and it is only the *substantive content* which is allegedly exempt from disclosure. But with respect to NSA's signals intelligence operations, the sensitive material comprises *more* than just the substantive content of messages. Harm could follow from the disclosure of any material that might help to identify the communications intercepted by NSA.

*Hayden,* 608 F.2d at 1384–85 (emphasis in original); *see also Halkin v. Helms,* 690 F.2d 977 (D.C.Cir.1982) (finding *Vaughn*-index in-

appropriate in the civil discovery context where the state secrets privilege is raised).

■ We next reject the Linders' assertion that the district court erred in failing to balance their need for the requested information against the Government's need for secrecy and its desire to avoid an undue burden. The protection afforded by section 6 is, by its very terms, absolute. If a document is covered by section 6, NSA is entitled to withhold it regardless of the requesting party's needs. The only question, then, is whether Judge Harris acted in a "clearly unreasonable, arbitrary or fanciful" manner when he concluded that to require compliance would have imposed an undue burden on NSA. Given the huge quantity of documents that were relevant to the Linders' requests and the likelihood that virtually all of them were privileged, we can reach no conclusion other than that the judge acted reasonably, responsibly, and with eminent common sense.

■ Finally, we turn to the Linders' assertion that the district court erred by failing to consider a less drastic alternative to quashing. While the Linders are correct that a modification of a subpoena is generally preferred to outright quashing, *see Northrop*, 751 F.2d at 403, it is difficult to see how theirs could be modified in any fruitful manner. Reducing the scope of the subpoena would reduce the burden imposed on NSA but would not increase the benefit to the Linders, which would remain zero in light of the fact that the overwhelming majority of responsive documents are immune from compulsory disclosure; and the remainder (the press clippings) are already in the public domain. Thus, even a subpoena of more limited scope would still be unduly burdensome. Similarly, while redaction may often be a proper and feasible technique in cases involving privileged documents, the unique nature of SIGINT reports makes it difficult, if not impossible, to redact "privileged" portions from "unprivileged" portions. As we explained in *Hayden*:

> with respect to NSA's signals intelligence operations ... [h]arm could follow from the disclosure of any material that might help to identify the communications intercepted by NSA, such as information about

date, time, origin, or manner of transmission or receipt.

608 F.2d at 1385.

### III. CONCLUSION

For the foregoing reasons, we find that the district court did not abuse its discretion in granting NSA's motion to quash. The order is, accordingly,

*Affirmed.*