David LINDER, Appellant,

v.

**DEPARTMENT OF DEFENSE,
et al., Appellees.**

Nos. 97–5033, 97–5034, 97–
5035 and 97–5226.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 9, 1997.

Decided Jan. 16, 1998.

See also: 963 F.2d 332 and 94 F.3d 693.

Gabor Rona argued the cause for appellant. With him on the briefs were Jennifer M. Green, Beth Stephens, Michael Ratner and Jules Lobel.

John D. Bates, Assistant U.S. Attorney, Washington, DC, argued the cause for appellees. With him on the brief were Mary Lou Leary, U.S. Attorney, R. Craig Lawrence, W. Mark Nebeker, and Kimberly N. Brown, Assistant U.S. Attorneys.

Before: HENDERSON, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The father of an American development worker tortured and killed by Nicaraguan contra soldiers appeals the district court's refusal to expand the scope of third-party subpoenas *duces tecum* issued to the Federal Bureau of Investigation, the Central Intelligence Agency, the Department of Defense, and the State Department, as well as its refusal to order those agencies to provide additional information about their withholding of certain documents under claims of privilege, including the state secrets privilege. Because the district court has yet to issue final orders with respect to the State and Defense Departments' subpoenas, we dismiss those appeals. We affirm the district court's ruling that the CIA properly invoked its statutory privileges. Finding that the district court failed to make the relevance determination required by Rule 26 of the Federal Rules of Civil Procedure, we reverse its order as to the scope of the CIA and FBI subpoenas.

I

After graduating from college in 1983, Benjamin Linder, a U.S. citizen and mechanical engineer, moved to Nicaragua to help bring electricity to the country's rural, undeveloped areas. Assisting in the building of dams and hydroelectric plants in the El Cua–San Jose de Bocay region, Linder began work on the construction of a weir, a small dam to measure water flow. On April 28, 1987, shortly after Linder and six other men arrived at the half-built dam, a Nicaraguan Democratic Force ("FDN") patrol, which had been waiting for Linder and his co-workers since early morning, attacked them with grenades and machine guns. Initially immobilized by non-fatal wounds to his legs and arms and stabbed thirty to forty times in his face, Linder died when a contra soldier shot him in the temple from less than two feet.

Seeking compensatory and punitive damages, Linder's parents and siblings filed a wrongful death action in the U.S. District Court for the Southern District of Florida against three contra organizations operating out of southern Florida—the United Nicaraguan Opposition and the Nicaraguan Resistance, in addition to the FDN—and four of their leaders, Adolfo Calero Portocarrero, Enrique Bermudez Varela, Aristides Sanchez Herdocia, and Indalecio Rodriguez Alaniz. Concluding that the Linders' action presented nonjusticiable political questions, the dis-

trict court dismissed the complaint. *Linder v. Calero Portocarrero,* 747 F.Supp. 1452, 1457 (S.D.Fla.1990). Although affirming the dismissal with respect to the three organizational defendants, the Eleventh Circuit directed the case to proceed against the four individuals as a tort action under Florida law. *Linder v. Portocarrero,* 963 F.2d 332, 337 (11th Cir.1992).

In their complaint, the Linders plead three alternative theories of liability. The first seeks to prove defendants' direct involvement in the torture and murder of Linder:

> Defendant Bermudez, and upon information and belief, defendants Calero, Sanchez, and Rodriguez, as members of the civilian-military command, ordered, authorized, approved, directed and ratified the attack on the Cua–Bocay development project, and ordered, authorized, approved, directed, and ratified the murder of Benjamin Linder and two others, on April 28, 1987.

Third Am. Compl. ¶ 39(a). Alleging that defendants participated in a conspiracy to murder, the second and third theories rely, in contrast, on circumstantial evidence of the nature, policies, and practices of the contra organizations, as well as defendants' roles in them. Under the second theory, the Linders seek to prove that defendants were the leaders of the contra organizations; that in those hierarchical organizations, soldiers in the field obeyed orders from their leaders; that the organizations, as a matter of policy established or approved by their leaders, tortured and killed foreign development workers and prisoners of war; and that Linder's torture and killing resulted directly from those policies. *Id.* ¶ 39(b). The third theory alleges that defendants led the hierarchical organizations; that defendants knew that the FDN tortured and executed defenseless and wounded individuals; that defendants failed to stop such practices, thus placing their imprimatur on them; and that Linder's killing resulted from those practices. *Id.* ¶ 39(c). Of significance to one of the issues before us—the scope of the subpoenas—the district court and the Eleventh Circuit approved the inclusion in the complaint of all three theories. *See* Order Den. in Part and Granting in Part Defs.' Mot. to Strike Second Am. Compl. and Granting Pls.' Mot. for Att'y's Fees at 5; *Linder,* 963 F.2d at 336–37.

Failing to obtain relevant documents from the two surviving defendants (Calero and Rodriguez), the Linders served third-party subpoenas *duces tecum* on the FBI, CIA, Defense and State Departments, and two other federal agencies, the National Security Agency and the Immigration and Naturalization Service. Each subpoena requested an extensive list of documents relating to Benjamin Linder, the April 28 attack, other similar attacks in the area, defendants' role in orchestrating such attacks, and the structure, organization, finances, policies, and practices of the three contra organizations. When the agencies refused to comply, claiming both burden and privilege, the Linders filed separate motions to compel against each agency in the U.S. District Court for the District of Columbia. The district court quashed the NSA subpoena, agreeing with the agency that the Linders' request was unduly burdensome, *Linder v. Calero–Portocarrero,* Misc. No. 94–148, 1995 WL 901765 (D.D.C.1995), *aff'd sub nom. Linder v. NSA,* 94 F.3d 693 (D.C.Cir.1996), and denied the motion to compel against the INS because that agency had already complied, *Linder v. Calero–Portocarrero,* Misc. No. 94–151 (D.D.C. Dec. 12, 1994). In an August 2, 1994, memorandum order, the district court agreed with the other agencies that the subpoenas imposed substantial burdens, denied the motions to compel, and ordered the parties to meet and explore modifying the subpoenas.

Unable to reach agreement, the parties submitted separate proposals. Slightly narrowing the range of their request, the Linders demanded documents concerning the attack in which Linder was killed and defendants' role in it, as well as documents containing general information about the contra organizations' structures and human rights policies and practices. The agencies proposed limiting the search to information about Benjamin Linder, the April 28 attack, another attack on a nearby hydroelectric plant, the El Cua–San Jose de Bocay region generally, and the four individual defendants.

In a December 12, 1994, order, the district court adopted the agencies' proposal, specifically excluding from the scope of the searches general information on the contra organizations' structures, policies, and practices.

During the next eight months, the agencies furnished the Linders with a number of documents responsive to the modified subpoenas. Claiming privilege, the agencies redacted some documents while completely withholding others.

Arguing that the agencies submitted insufficient information about the withheld documents and their claims of privilege, the Linders filed a "motion for further relief," asking the district court to order *Vaughn* indices and to review the documents *in camera*. Their motion for further relief also asked the court to expand the scope of the searches, claiming that the modified subpoenas failed to produce certain relevant information such as documents concerning contra policies towards civilians, foreigners, and other non-military targets. In opposition, the agencies filed declarations describing their compliance with the modified subpoenas, their reasons for withholding information, and their estimates of the time and effort the additional searches would require.

On December 6, 1996, the district court denied in full the Linders' motion for further relief against the FBI and the State and Defense Departments and granted in part and denied in part the motion with respect to the CIA. Rejecting the Linders' request for *in camera* review as both excessive and unnecessary and examining each invocation of privilege, the court found that, except for two claims by the CIA, the claims fell within legitimate exemption categories under the Freedom of Information Act, 5 U.S.C. § 552 (1994 & Supp.1996). Finding that the CIA's Directorate of Operations failed to describe or define seven documents that it completely withheld, and that its Directorate of Science and Technology failed to describe the content, general nature, creators, or copyright owners of three videotapes it withheld as well as the applicable copyright laws, the district court ordered the agency to submit more detailed documentation. As to the Linders'

request for an expanded search, the district court applied FOIA analysis, finding that the agencies had made "reasonable" searches for the documents specified under the modified subpoena and that "the agencies cannot be compelled to execute additional searches simply because plaintiffs are unsatisfied with the results." The court also pointed out that in connection with its earlier modification of the scope of the subpoenas, it had held that "any information relevant to plaintiffs' case could be found by the more limited search[ ]." Concluding that the Linders failed to demonstrate a compelling need or evidence of clear bad faith required to justify additional searches that would impose an "onerous burden" on the agencies, the district court denied their request for an expanded search.

Responding to the December 1996 order, the CIA filed a redacted, *ex parte* declaration by William H. McNair, the information review officer of the Directorate of Operations, which explained the general types of information protected by the appropriate statutory privileges, the potential harm of disclosing such information, and the particular documents withheld. The agency also advised the court that it had offered the Linders' counsel access to the videotapes. After the Linders moved for leave to file out of time and for expedited consideration of both their objections to the McNair declaration and their request for production of documents, the district court, in an order dated June 24, 1997, denied the motion and denied with prejudice any further relief with regard to the CIA. Having reviewed the withheld CIA documents *in camera* "out of an abundance of caution," the court concluded that "the CIA's assertions are both soundly based and sufficient."

David Linder, the father, now appeals from the district court's December 1996 and June 1997 decisions. Although he originally appealed from the district court's December 1996 order in February 1997, we dismissed the appeal with respect to the CIA because the district court had not finished its consideration of that agency's privilege claims. When Linder appealed the district court's June 1997 order regarding the CIA, we consolidated that appeal with the earlier appeals

involving the FBI and the State and Defense Departments.

## II

■ The FBI and the State and Defense Departments argue that we lack jurisdiction to hear the appeals in their cases, claiming that the district court's December 1996 order denying the Linders' motion for further relief was not a final order for purposes of appellate jurisdiction. Because the motion for further relief neither asked the district court to resolve the merits of the privilege claims nor requested production of the withheld documents, the agencies contend that these issues remain open in the district court, *i.e.*, that the Linders may still seek production of specific documents and resolution of the privilege claims. Reviewing this jurisdictional claim *de novo*, *see Board of Trustees of Hotel and Rest. Employees Local 25 v. Madison Hotel, Inc.*, 97 F.3d 1479, 1483 (D.C.Cir. 1996), we agree with the government with respect to the State and Defense Departments, but not the FBI.

■ We have held that "[a]n order denying discovery in one district court's jurisdiction arising from litigation pending in another jurisdiction may be appealed without awaiting final judgment on the underlying litigation." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 n. 5 (D.C.Cir.1984). Even in such cases, however, our jurisdiction remains limited to "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291 (1994). As the Supreme Court has held, a district court order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. Hence, ordinarily ... appellate review may be had only upon an order or judgment disposing of the whole case, and adjudicating all rights." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633–34, 89 L.Ed. 911 (1945) (citation omitted).

To determine whether the district court's December 1996 order is a final, appealable judgment with respect to the FBI and the State and Defense Departments, we begin by examining the relief the Linders sought in their motion for further relief. In that mo-

tion, the Linders asked the agencies to do three things:

(1) to supply plaintiffs with a list and description of documents withheld pursuant to claims of privilege and a declaration detailing the grounds for invoking the various statutory or other privileges; (2) to furnish to the Court for *in camera* review those documents withheld pursuant to claims of privilege and/or lack of relevance; and (3) to conduct a further search for documents concerning the policy and practice of defendants' forces toward civilians, wounded, prisoners of war and foreigners working in Nicaragua.

Mot. Further Relief at 1. Although the Linders sought and received final resolution of their third request (additional searches), neither the motion itself nor the supporting memorandum of law requested the district court to resolve the ultimate issue underlying their first two requests—whether the claimed privileges in fact protected the withheld documents from disclosure—or even to order the documents' production. Contending instead that "the agencies did not supply complete information about the documents reviewed ... [or] submit sufficient information about their reasons for claiming privilege," the Linders only sought information that would enable them to assess and, if necessary, to challenge the privilege assertions through additional motions to compel. The district court, moreover, denied the Linders only the specific relief they sought—*Vaughn* indices and *in camera* review. The court's order for each agency neither resolved the privilege claims nor determined whether the withheld documents should be produced.

■ Asserting that the district court has for all practical purposes rejected their claims, David Linder argues that nothing more would be gained by further proceedings in the district court. Although we agree with Linder that the district court's opinion certainly suggests that the agencies properly asserted their claims of privilege, we think that is insufficient to transform the orders into final, appealable judgments. Efficient judicial administration requires that a final

judgment clearly appear from the relief a party seeks in its motion and the district court's response to that request in its order. Appellate courts should not have to sort through district court opinions to determine if they resolve all pending claims, especially where, as here, such resolution was never requested. By requiring the district court to "fully disassociate[ ] itself from a case or claim" before permitting a party to appeal, *Trout v. Garrett,* 891 F.2d 332, 335 (D.C.Cir. 1989), the final judgment rule avoids the "mischief of economic waste and of delayed justice" that can accompany piecemeal litigation. *Radio Station WOW, Inc. v. Johnson,* 326 U.S. 120, 124, 65 S.Ct. 1475, 1478, 89 L.Ed. 569 (1945); *see also Colonial Times, Inc. v. Gasch,* 509 F.2d 517, 523 (D.C.Cir. 1975) (final judgment rule usually precludes review of discovery orders).

In this case, the district court's December 1996 order, though hinting at the court's ultimate conclusion, fails to satisfy this bright-line test with respect to the FBI and the State and Defense Departments. The court never formally ruled on the merits of the privilege claims, neither ordering nor denying production of the withheld documents. Indeed, had the Linders challenged the validity of the State and Defense Departments' invocation of the state secrets privilege, as David Linder attempts to do in this court, the parties and the district court would have had much "to do." *Catlin,* 324 U.S. at 233, 65 S.Ct. at 633–34. As required by *Ellsberg v. Mitchell,* 709 F.2d 51 (D.C.Cir. 1983)—not FOIA, as the district court seemed to think—the court would have had to examine whether each challenged document's disclosure would threaten national security. *Id.* at 57–58. Because the privilege "is not to be lightly invoked," the court would have had to ensure that each agency made a "formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953) (footnotes omitted). If the agencies had formally invoked their privileges, the court would have had to make sure that they either provided some form of detailed public explanation of "the kinds of injury to

national security [they] seek[ ] to avoid and the reason those harms would result from revelation of the requested information," or indicated "why such an explanation would itself endanger national security." Or, if necessary, the court would have had to examine the privileged materials *in camera* to satisfy itself that invocation of the privilege was proper. *Ellsberg,* 709 F.2d at 63–64. The district court then would have had to make serious and substantive judgments about the government's claims:

> [T]he more compelling a litigant's showing of need for the information in question, the deeper "the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." ... [T]he more plausible and substantial the government's allegations of danger to national security, in the context of all the circumstances surrounding the case, the more deferential should be the judge's inquiry into the foundations and scope of the claim.

*Id.* at 58–59 (quoting *Reynolds,* 345 U.S. at 11, 73 S.Ct. at 533) (footnotes omitted). Under all of these circumstances, the cases against the State and Defense Departments are far from final.

■ The appeal from the FBI order presents a different situation. Linder appeals only the district court's refusal to expand the scope of the search, effectively waiving, as counsel confirmed at oral argument, his challenge to the FBI's assertion of privilege. Because the district court resolved the scope issue—*i.e.,* it "fully disassociate[d] itself" from the question, *Trout,* 891 F.2d at 335— the FBI case is now appealable.

### III

■ For his substantive claims against the FBI, as well as the CIA, David Linder challenges the district court's December 1996 denial of his family's request to expand the scope of the subpoenas to include documents concerning the policies and practices of the contra organizations regarding civilians, the wounded, prisoners of war, and foreigners working in Nicaragua. In denying the Linders' request for additional searches, the district court referred back to its earlier determination that a limited

search was appropriate and stated that the Linders had provided no reason why the court should alter that decision: "The Court cannot justify the enforcement of such extensive, time-consuming searches without a showing of compelling need and clear bad faith on the part of the agencies." Because the district court enjoys wide latitude in resolving discovery issues, we review its determination of the scope of the subpoenas for abuse of discretion. *Northrop Corp.*, 751 F.2d at 399. An abuse of discretion occurs when the court applies the wrong legal standard or relies on clearly erroneous facts. *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997).

 Under Rule 26 of the Federal Rules of Civil Procedure, parties to litigation may discover all relevant, non-privileged information. A party:

> may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

FED.R.CIV.P. 26(b)(1). If a subpoena for relevant information imposes an "undue burden," the court may modify the subpoena or quash it altogether. FED.R.CIV.P. 45(c)(3)(A)(iv). The "burden of proving that a subpoena is oppressive is on the party moving to quash." *Northrop*, 751 F.2d at 403. Whether a burdensome subpoena is reasonable "must be determined according to the facts of the case," such as the party's need for the documents and the nature and importance of the litigation. *Id.* at 407.

 Applying these standards, we find two problems with the district court's December 1996 order. First, although the FBI submitted an affidavit estimating that the additional search would require up to 2142 person-hours, the district court simply as-

sumed that the CIA, which provided no estimate of its own, would face a similar burden. Without evidence from the CIA describing the precise nature of its burden, however, we see no way for the district court to exercise its admittedly broad discretion or for us to review it. Because the agency has the burden of proving oppressiveness, the district court cannot assume that the burden on one agency will be the same as the burden on another.

Second, nothing in the December 1996 order indicates that the court considered the relevance of the requested information to the second and third theories of the Linders' case, theories approved by both the Florida district court and the Eleventh Circuit. Although the district court acknowledged these theories when ordering compliance with the modified subpoenas in December 1994, it concluded that "to the extent that defendants, in their capacities as leaders of the contra organizations, approved or otherwise ratified the activities relating to the attack that caused Linder's death, or ratified directives issued to any persons concerning the attack, such documents will be identified in the searches proposed by the agencies." But the Linders seek to discover more than direct information about whether the individual defendants approved or ratified Benjamin Linder's killing. To prove their second and third theories, they seek general information about the organizations' policies and practices toward civilians, foreigners, prisoners of war, and the wounded, information they claim was not produced in the search for documents directly linking the defendants to the killing. According to David Linder, such information may very well provide the "building blocks" his family needs to prove its case.

We thus reverse the district court's decision to limit the scope of the FBI and CIA subpoenas. On remand, the district court should assess the relevance of the requested information to all three of the Linders' theories. To the extent such information satisfies Rule 26's broad definition of relevance, the district court may decline to order the agencies to search for that information only if the agencies satisfy their heavy burden of proving oppressiveness or establish some other recognized ground for modifying or quashing subpoenas for relevant information.

## IV

This brings us finally to David Linder's challenge to the district court's acceptance of the CIA's claims of privilege with respect to seven documents originating from the agency's Directorate of Operations. The CIA withheld the documents based on statutory protections for information that would reveal intelligence sources and methods, 50 U.S.C. § 403–3(c)(5) (1994) (now codified at 50 U.S.C.A. § 403–3(c)(6) (1991 & Supp.1997) (as amended by Pub.L. No. 104–293, 110 Stat. 3461 (1996))), as well as information concerning the agency's personnel, including their functions, names, and official titles, *id.* § 403g. Because judges "have little or no background in the delicate business of intelligence gathering," courts must give "great deference" to the Director of Central Intelligence's determination that a classified document could reveal intelligence sources and methods and endanger national security. *CIA v. Sims,* 471 U.S. 159, 176, 179, 105 S.Ct. 1881, 1891, 1893, 85 L.Ed.2d 173 (1985).

In upholding the CIA's claims of privilege, the district court relied on very detailed information contained in the *ex parte* declaration of William McNair. Paragraphs 10–31 of the declaration explain the potential harms to national security from the disclosure of intelligence sources, intelligence methods, location of covert CIA field installations, CIA employee names and organizational data, and cryptonyms and pseudonyms. Paragraph 35, redacted from the public version of the declaration, specifically discusses six of the withheld documents, and paragraph 36 explains that their release would reveal the names of CIA employees and employee numbers, internal organizational data, locations of CIA installations, and cryptonyms. Describing the seventh document as a "source-identifying cable that accompanied an intelligence report that is a part of the releasable group of documents," paragraph 37 states that the "document does not contain any substantive information on the Linder incident" and that its disclosure would reveal an intelligence source, internal organizational data, location of CIA foreign installations, and cryptonyms.

In addition to reviewing the McNair declaration *in camera,* the district court examined the withheld documents. Given the detailed information contained in the McNair declaration and the district court's own review of the documents, we find no abuse of discretion in the court's determination that the CIA properly justified its statutory claims of privilege over the seven withheld documents. *See Linder,* 94 F.3d at 695–98 (accepting a similar declaration as justifying the NSA's invocation of privilege under section 6 of the National Security Act of 1959, Pub.L. No. 86–36, 73 Stat. 63, 64, *quoted in* 50 U.S.C. § 402 note (1994)); *United States v. Koreh,* 144 F.R.D. 218, 222 (D.N.J.1992) (upholding a CIA claim of statutory privilege after reviewing a similar declaration from a CIA information review officer as well as the withheld documents themselves).

## V

We dismiss the appeals with respect to the State and Defense Departments and affirm the district court's approval of the CIA's privilege claims. We reverse the denial of the Linders' request to expand the scope of the CIA and FBI subpoenas and remand for further proceedings consistent with this opinion.

*So ordered.*