**Sibel EDMONDS, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

**Civil Action No. 02–1448(RBW).**

United States District Court, District of Columbia.

July 6, 2004.

David K. Colapinto, Kohn, Kohn & Colapinto, P.C., Mark S. Zaid, Krieger & Zaid, PLLC, Washington, DC, for Plaintiff.

Vesper Mei, U.S. Department of Justice, Washington, DC, for Defendants.

### MEMORANDUM OPINION

WALTON, District Judge.

Following the terrorist attacks against our nation on September 11, 2001, the plaintiff was hired by the Federal Bureau of Investigation ("FBI") "as a contract linguist to perform translation services[.]" Complaint ("Compl.") ¶ 10. During the course of her employment with the FBI, the plaintiff asserts that she "reported a number of whistleblower allegations to FBI management officials concerning serious breaches in the FBI security program and a break-down in the quality of translations as a result of willful misconduct and gross incompetence." *Id.* ¶ 15. After the plaintiff's employment with the FBI was terminated, she filed the instant lawsuit

alleging claims pursuant to the Privacy Act, 5 U.S.C. § 552a *et seq.* (2000), the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551–52, 701–06 (2000), and the First and Fifth Amendments to the United States Constitution.[1] *Id.* ¶ 1. This matter is currently before the Court on the defendants' motion to dismiss the plaintiff's complaint ("Defs.' Mot."), in which the Attorney General of the United States has "formally assert[ed] the state secrets privilege to protect certain classified, national security information that goes to the core of the plaintiff's allegations [from being] disclosed." [2] Defs.' Mot., Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Complaint Based on the State Secrets Privilege

("Defs.' Mem.") at 1. Upon consideration of the parties' submissions, *ex parte in camera* reviews of classified declarations submitted by the Attorney General and the Deputy Director of the FBI, and for the reasons set forth below, the Court will grant the defendants' motion to dismiss this case.

## I. *Factual Background*

Although much of the information concerning the plaintiff's employment history with the FBI is classified and therefore will not be referenced in this opinion,[3] the plaintiff contends that between December 2001 and March 2002, while employed by the FBI, she reported a number of alleged acts of misconduct to the FBI.[4] Compl.

1. The Court notes that the plaintiff also filed a lawsuit against the FBI pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a, seeking documents related to her employment with the FBI. *See Edmonds v. FBI*, 272 F.Supp.2d 35 (D.D.C.2003) (Huvelle, J.). Of particular significance to this case is Judge Huvelle's grant of summary judgment to the government on its assertion of Exemption 1 of the FOIA as grounds for refusing to disclose certain documents. *Id.* at 45–49. As noted by Judge Huvelle, "Exemption 1 protects from mandatory disclosure under FOIA matters that are '(A) specifically authorized under criteria established by an Executive order to be secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.' " *Id.* at 45 (quoting 5 U.S.C. § 552(b)(1)).

2. Also currently pending before it is an Emergency Motion of the United States to Quash Deposition of Sibel Edmonds, or for Protective Order filed with this Court in *Burnett v. Al Baraka Investment & Development Corp.,* Civ. A. No. 03–9849 (S.D.N.Y.). The United States seeks to have this Court quash a subpoena issued by the plaintiffs in *Burnett,* asserting that the states secret privilege precludes the *Burnett* plaintiffs from deposing Ms. Edmonds.

3. The contents of this Opinion contain only information that is already in the public domain (*i.e.,* the plaintiff's complaint) and which

the government has not sought to have concealed through a sealing order or otherwise.

4. These reports of misconduct included allegations that:

> (a) another employee, a contract monitor, who was granted a security clearance by the FBI, had past and ongoing association with one or more targets of an ongoing FBI investigation; (b) this same other employee was translating information obtained from FBI wire-taps concerning one or more targets with whom she had past and ongoing improper contacts; (c) the same other employee was suspected of leaking information to one or more targets of an FBI investigation to which she was assigned to perform translation services; (d) the other employee improperly instructed Plaintiff and another employee not to listen and translate certain FBI wire-taps because she knew the subjects and was confident that there would be nothing important to translate concerning those subjects or their conversations; (e) Plaintiff's supervisor issued instructions that assisted the other employee in carrying out misconduct; (f) the other employee threatened the lives and safety of Plaintiff and Plaintiff's family members, who were citizens of, and resided in, a foreign country, because Plaintiff refused to go along with the other employee's scheme to obstruct justice and because Plaintiff report-

¶ 15. On February 7, 2002, the plaintiff states that she wrote a letter to the Acting Assistant Supervisory Agent in Charge ("ASAC") detailing her "concerns about security and management problems in the language department and requesting that prompt corrective action be taken." *Id.* ¶ 17. During the following week on February 13, 2002, the plaintiff states that she wrote a letter to an Executive Assistant Director for the FBI, "notifying him of [her] serious security concerns which potentially put Plaintiff's personal safety and the safety of her family at risk." *Id.* ¶ 20. The plaintiff then met with a Deputy Assistant Director for the FBI on March 7, 2002, to discuss her reports of misconduct. *Id.* ¶ 22. That same day, the plaintiff filed complaints with the FBI's Office of Professional Responsibility ("OPR") and the Department of Justice's Office of Inspector General ("OIG") detailing her "allegations of serious security breaches and misconduct." *Id.* ¶ 23. The plaintiff's employment with the FBI was terminated on March 22, 2002, *id.* ¶ 24, and a letter was sent to the plaintiff on April 2, 2002, explaining that her contract was "terminated completely for the Government's convenience." *Id.* ¶ 25.

Following the termination of her employment with the FBI, many of the events that now serve as the predicate to the plaintiff's claims in this lawsuit occurred. On May 8, 2002, the plaintiff states that her attorney sent a letter to both Attorney General John Ashcroft and FBI Director Robert S. Mueller indicating that "as a direct result of the FBI's failure to address or correct the serious misconduct and security breaches that were reported by Plaintiff[,] the safety and security of Plaintiff and her family has been jeopardized and that a foreign country has targeted Plaintiff's sister to be interrogated 'and taken/arrested by force.'" *Id.* ¶ 26. On this same day, Senator Charles E. Grassley sent a letter to the Director of the FBI indicating that the plaintiff "has come forward with a number of disturbing allegations about misconduct, incompetence, potential security violations and retaliatory threats." *Id.* ¶ 27. Senator Grassley also asked the FBI Director to "emphasize to [FBI] officials ... that retaliation against current or former FBI employees is not acceptable, especially when retaliation endangers a person's family member." *Id.* On June 8, 2002, the Associated Press ("AP") published an article that was purportedly "widely disseminated on its news wire, quoting 'Government officials, who spoke only on condition of anonymity,' about Plaintiff." *Id.* ¶ 28. This AP article stated that the defendants were conducting an investigation of the plaintiff's "whistleblower 'allegations of security lapses in the translator program that has played an important role inter-

---

ed her concerns about the other employee's wrongdoing to FBI management; (g) both as a result of misconduct by the other employee and Plaintiff's supervisor, and as a result of gross incompetence in the department, numerous translations were not properly conducted, and/or intentionally not conducted, which threatened intelligence and law enforcement investigations related to September 11th and other ongoing ... law enforcement investigations; (h) work order documents concerning translations related to September 11th investigations were falsified and contained forgeries of Plaintiff's name and/or initials; (i) Plaintiff's supervisor issued an instruction forbidding Plaintiff from raising her concerns to the FBI Special Agent assigned to the case, or others, without the permission of Plaintiff's supervisor; (j) extremely sensitive and material information was deliberately withheld from translations; and (k) FBI management had failed to take corrective action in response to Plaintiff's reports and serious concerns, and retaliated against Plaintiff for reporting her concerns.

Compl. ¶ 16.

preting interviews and intercepts of Osama bin Laden's network since Sept. 11.'" *Id.* ¶ 29. These officials who are alleged to have anonymously related this information to the AP also indicated that "the FBI has been unable to corroborate the whistleblower's allegations[,]" *id.,* that the plaintiff "subsequently was subjected to a security review herself," *id.* ¶ 30, and that "[t]he FBI has focused its investigation on whether either the accused or the whistleblower compromised national security[.]" *Id.* ¶ 31. Then, on June 18, 2002, the Washington Post published an article, again "citing to Government officials who [stated that] the FBI fired Plaintiff because her disruptiveness hurt her on-the-job performance." *Id.* ¶ 32 (internal quotation marks omitted). The Washington Post article also reported that FBI officials stated that the plaintiff "had been found to have breached security." *Id.*

The plaintiff commenced the instant lawsuit on July 22, 2002. The plaintiff's Privacy Act claim alleges that confidential information maintained in the defendants' systems of records was unlawfully released to unauthorized individuals including "information that Plaintiff was subject to a security review, [and information about the] Plaintiff's job performance and other information contained in the Defendants' personnel, security and investigative files . . . ." *Id.* ¶ 37. The plaintiff's First Amendment claim alleges that her complaints about misconduct constituted protected First Amendment conduct and that her termination amounted to retaliation by the FBI. *Id.* ¶¶ 51–52. Finally, the plaintiff's Fifth Amendment claim asserts that the termination of her employment and interference with her ability to obtain future employment by the defendants violated her rights to procedural due process and her due process liberty interest. *Id.* ¶ 63.

## II. *Legal Analysis*

■ The state secrets privilege is a common law evidentiary rule that permits the United States to "block discovery in a lawsuit of any information that, if disclosed, would adversely affect national security." *Ellsberg v. Mitchell,* 709 F.2d 51, 56 (D.C.Cir.1983). The District of Columbia Circuit has explained that "[t]he various harms, against which protection is sought by invocation of the privilege, include impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *Id.* at 57 (footnotes omitted). A brief review of the history of the state secrets privilege is a necessary predicate to addressing the government's assertion of this privilege.

The origins of the state secrets privilege can be traced back to the treason trial of Aaron Burr in *United States v. Burr,* No. 14,692D, 25 F. Cas. 30 (C.C.D.Va.1807). *See In re United States,* 872 F.2d 472, 474–75 (D.C.Cir.1989); *Ellsberg,* 709 F.2d at 56 n. 21. In *Burr,* the defendant sought access to a letter from General Wilkinson, who was the primary witness for the government against the defendant, to President Thomas Jefferson that purportedly contained information "in relation to the transactions of Mr. Burr, 'of whose guilt,' [General Wilkinson] says, 'there can be no doubt.'" 25 F. Cas. at 32. The government objected to the production of this letter, asserting that it was

improper to call upon the president to produce the letter of Gen. Wilkinson, because it was a private letter, and probably contained confidential communications, which the president ought not and could not be compelled to disclose. It might contain state secrets, which could not be divulged without endangering the national safety.

*Id.* at 31. Chief Justice Marshall, writing for the Court, noted that "such circumstances present a delicate question" because this was a capital case in which the defendant claimed that the letter was material to his defense. *Id.* at 37. The *Burr* Court, however, did not have to resolve whether this letter should be disclosed because there was "nothing before the court which show[ed] that the letter in question contain[ed] any matter the disclosure of which would endanger the public safety." *Id.* Chief Justice Marshall stated that "[i]f it does contain any matter which it would be imprudent to disclose, which it is not the wish of the executive to disclose, such matter, if it be not immediately and essentially applicable to the point, will, of course, be suppressed." *Id.*

In 1875, the Supreme Court had the occasion to address the state secrets privilege in the case of *Totten v. United States,* 92 U.S. 105, 2 Otto 105, 23 L.Ed. 605 (1875). In *Totten,* a lawsuit was

> brought to recover compensation for services alleged to have been rendered by ... William A. Lloyd, under a contract with President Lincoln, made in July 1861, by which he was to proceed South and ascertain the number of troops stationed at different points in the insurrectionary States, procure plans of forts and fortifications, and gain such other information as might be beneficial to the government of the United States, and report the facts to the President; for which services he was to be paid $200 a month.

*Id.* at 105–06, 2 Otto 105. The Supreme Court found the suit could not be maintained, concluding:

> It may be stated as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the

law itself regards as confidential, and respecting which it will not allow the confidence to be violated. On this principle, suits cannot be maintained which would require a disclosure of the confidences of the confessional, or those between husband and wife, or of communications by a client to his counsel for professional advice, or of a patient to his physician for a similar purpose. Much greater reason exists for the application of the principle to cases of contract for secret services with the government, as the existence of a contract of that kind is itself a fact not to be disclosed.

*Id.* at 107, 2 Otto 105.

Although these early cases recognized the existence of the state secrets privilege, it was not until after World War II that this doctrine's "lineaments [were brought] into reasonably sharp focus." *Ellsberg,* 709 F.2d at 56. In the seminal case of *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), a lawsuit was brought against the United States for the wrongful death of three civilians who were aboard a B–29 military airplane that crashed in Georgia. *Id.* at 2–3, 73 S.Ct. 528. The military crew and the civilians aboard the airplane were conducting a test of secret electronic equipment when the plane crashed. *Id.* at 3, 73 S.Ct. 528. During the pretrial phase of the litigation, the plaintiffs sought discovery of the government's accident investigation report and the statements of the surviving crew members. *Id.* The government opposed the plaintiffs' discovery motion, claiming that Air Force regulations prevented the disclosure of the requested information. *Id.* at 3–4, 73 S.Ct. 528. Following the district court's grant of the plaintiffs' discovery motion, the Secretary of the Air Force sought reconsideration and filed a formal "Claim of Privilege," asserting that the documents should not be produced

"for the reason that the aircraft in question, together with the personnel on board, were engaged in a highly secretive mission of the Air Force." *Id.* at 4, 73 S.Ct. 528. In addition, the Judge Advocate General of the Air Force filed an affidavit attesting to the fact that documents could not be produced "without seriously hampering national security, flying safety and the development of highly technical and secret military equipment." *Id.* at 4–5, 73 S.Ct. 528. The district court denied the government's motion for reconsideration and ordered the government to produce the documents. *Id.* at 5, 73 S.Ct. 528. The government subsequently declined to produce the information and the district court "entered an order ... [which indicated] that the facts on the issue of negligence would be taken as established in [the] plaintiffs' favor[,]" and entered a final judgment for the plaintiffs. *Id.* In reversing the district court's decision, the Supreme Court began its analysis by noting that

> [j]udicial experience with the privilege which protects military and state secrets has been limited in this country. English experience has been more extensive, but still relatively slight compared with other evidentiary privileges. Nevertheless, the principles which control the application of the privilege emerge quite clearly from the available precedents. The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. *It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing*

> *a disclosure of the very thing the privilege is designed to protect.*

*Id.* at 7–8, 73 S.Ct. 528 (emphasis added) (footnotes omitted). The *Reynolds* Court went on to note that the

> court must be satisfied from all the evidence and circumstances, and from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. If the court is so satisfied, the claim of the privilege will be accepted without requiring further disclosure.

*Id.* at 9, 73 S.Ct. 528 (internal quotations and citation omitted). As a general rule, the Supreme Court stated that

> the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but *even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake.* A fortiori, where necessity is dubious, a formal claim of privilege, made under the circumstances of this case, will have to prevail.

*Id.* at 11, 73 S.Ct. 528 (emphasis added) (footnote omitted).

With the *Reynolds* case establishing the contours of the invocation of the state secrets privilege, those cases that have followed have attempted to sharpen the focus of the scope of judicial inquiry into this privilege. The District of Columbia Circuit has stated that "[t]o some degree at least, the validity of the government's assertion must be judicially assessed." *Molerio v. FBI*, 749 F.2d 815, 822 (D.C.Cir.

1984). In this regard, the *Reynolds* Court had cautioned that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." 345 U.S. at 9–10, 73 S.Ct. 528. And, the District of Columbia Circuit noted that "[t]o properly fulfill its obligations, while according the utmost deference to the executive's expertise in assessing privilege upon grounds of military or diplomatic security, *a court must uphold the privilege if the government shows that the information poses a reasonable danger to secrets of state.*" *In re United States,* 872 F.2d at 475 (internal quotation marks and citations omitted) (emphasis added).

**(A) *Has the Government Properly Invoked the State Secrets Privilege?***

**(1) Personal Consideration Requirement**

At the outset, this Court must address the plaintiff's contention that the defendants have not properly invoked the state secrets privilege in this case. Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp'n") at 8–11. The plaintiff asserts that "the Attorney General does not explicitly state in his declaration that he has reviewed any documents other than a classified declaration prepared by a lower-ranking official, Bruce Gebhardt, the Deputy Director of the FBI." *Id.* at 9 (citing Declaration of John Ashcroft ("Ashcroft Decl.") ¶ 2). The plaintiff claims that "[t]his [Declaration] falls far short of the personal consideration and specificity requirements governing affidavits filed by heads of departments who assert the state secrets privilege." *Id.* (citations omitted).

■ To formally invoke the state secrets privilege, there must be: (1) a "formal claim of privilege," (2) "lodged by the head of the department which has control over the matter," (3) "after actual personal consideration by that officer." *Reynolds,*

345 U.S. at 7–8, 73 S.Ct. 528. On October 18, 2002, Attorney General Ashcroft filed a declaration with this Court, explaining that the

> purpose in submitting [the] Declaration is to assert, at the request of the Director of the Federal Bureau of Investigation, and in my capacity as Attorney General and head of the Department of Justice a formal claim of the state secrets privilege in order to protect the foreign policy and national security interests of the United States.

Ashcroft Decl. ¶ 2. The Attorney General explained that his "statements in this declaration are based on [his] personal knowledge, on information provided to [him] in [his] official capacity, and on [his] evaluation of that information." *Id.* The Attorney General further explained that "[i]n personally considering this matter, I have also considered a classified declaration by Bruce J. Gebhardt, the Deputy Director of the Federal Bureau of Investigation...." *Id.*

■ The Court finds that the Attorney General has complied with the necessary prerequisites for the formal invocation of the state secrets privilege. It is undisputed that the Declaration of Attorney General Ashcroft constitutes a "formal claim of privilege" that has been asserted by the Attorney General in his capacity as head of the Department of Justice, which is the agency in control over the matter at issue. Relying principally upon the case of *Yang v. Reno,* 157 F.R.D. 625 (M.D.Pa.1994), the plaintiff disputes whether the Attorney General has complied with the third prerequisite for invoking the state secrets privilege—the actual personal consideration by the Attorney General. In *Yang,* the government, as an alternative theory, asserted several privileges to limit the scope of discovery to prevent the plain-

tiffs, aliens from the People's Republic of China who were arrested and detained after their ship ran aground in New York Harbor, from taking "limited discovery from the government regarding potential political interference and/or bias by the Clinton Administration in the asylum proceedings pertinent to [the] case." *Id.* at 630. William H. Itoh, the executive secretary of the National Security Council ("NSC"), attempted to invoke the state secrets privilege to limit the scope of inquiry by the plaintiffs during the depositions of a staff member of the NSC and the former General Counsel of the Immigration and Naturalization Service. *Id.* at 630, 632. In denying the government's invocation of the state secrets privilege, the district court found that (1) Itoh was not competent to invoke the state secrets privilege, as he did not have the "kind of political and policy making authority contemplated by the *Reynolds* Court[,]" *id.* at 633, (2) there was a lack of personal consideration of "the material for which the privilege was sought," *id.* at 634, and (3) there was a "lack of particularity in the government's identification of the material withheld and the reasons for withholding it." *Id.* In finding that there was a lack of personal consideration, the *Yang* Court examined the Itoh declaration, which indicated that he was "familiar with the types of issues and information that could arise should petitioners be permitted to question NSC staff regarding deliberations and recommendations of the Border Security Working Group [BSWG]" and that he "understand[s] that on a number of separate occasions, members of the BSWG attended meetings with and briefed the President and Vice President to discuss and develop United States Government policy with regard to the smuggling of aliens. . . ." *Id.* The *Yang* Court concluded that "[b]ecause Mr. Itoh does not appear to have reviewed the specific content of

the material for which privilege is sought, he is not competent to assert the state secrets . . . privilege[ ]." *Id.* This is not the case here.

As noted above, the Attorney General states in his Declaration invoking the state secrets privilege that his statements "are based on [his] personal knowledge, on information provided to [him] in [his] official capacity, and on [his] evaluation of that information." Ashcroft Decl. ¶ 2. And he further notes, "[i]n personally considering this matter, I have also considered a classified declaration by Bruce J. Gebhardt, the Deputy Director of the Federal Bureau of Investigation. . . ." *Id.* In addition, his Declaration states

> I understand that this lawsuit was filed by Sibel Edmonds, a former contract linguist with the FBI, and alleges violations of the Privacy Act, the First and Fifth Amendments of the United States Constitution, and the Administrative Procedures Act. I have been informed generally of the nature of plaintiff's claims in this case.

Id. ¶ 4. Attorney General Ashcroft goes on to state:

> Based on my personal consideration of the matter, I have concluded that further disclosure of the information underlying this case, including the nature of the duties of plaintiff or the other contract translators at issue in this case reasonably could be expected to cause serious damage to the national security interests of the United States.

Id. ¶ 5.

In *Yang,* the Court concluded that the personal consideration requirement of *Reynolds* was lacking since "Mr. Itoh d[id] not appear to have reviewed the specific content of the material for which privilege [was] sought[.]" 157 F.R.D. at 634. In this case, the Attorney General was in-

formed of the plaintiff's claims and personally considered not only the nature of her claims,[5] but also information provided in a classified declaration prepared by the Deputy Director of the FBI that details the damage to both foreign policy and national security that would result from the disclosure of information related to the plaintiff's employment with the FBI. The Attorney General's Declaration is similar to one submitted to the court in *Kasza v. Browner*, 133 F.3d 1159 (9th Cir.1998). In that case, the Secretary of the Air Force stated:

> This Declaration is made for the purpose of advising the court of the national security interests in and the security classification of information that may be relevant to the above captioned lawsuits. The statements made herein are based on (a) my personal consideration of the matter; (b) my personal knowledge; and (c) my evaluation of information made available to me in my official capacity.

*Id.* at 1168. In finding that there was the actual personal consideration necessary to invoke the state secrets privilege by the Secretary of the Air Force, the Ninth Circuit noted that "explaining through a competent official such as [the Air Force Vice Chief of Staff] how the claim of privilege plays out in practice is consistent with *Reynold's* insistence that the decision to object be made at the highest level." *Id.* at 1169 (citing *In re United States,* 872 F.2d at 474 (classified declaration of assistant director of the FBI's Intelligence Division submitted for *in camera* review in support of Attorney General's formal invocation of the state secrets privilege); *Molerio*, 749 at 821 (suggesting that designee

could determine that state secret privilege was implicated in discovery); *Halkin v. Helms*, 598 F.2d 1, 9 (D.C.Cir.1978) (privilege invoked by Secretary of Defense was supported by *in camera* testimony of Deputy Director of the National Security Agency)). Here, not only does the Attorney General's Declaration reflect a similar level of personal consideration as the declaration submitted by the Secretary of the Air Force in *Kasza*, but it too is supported by a classified declaration of a competent subordinate official—the Deputy Director of the FBI. Thus, the Court finds that the Attorney General has satisfied the "personal consideration" requirement of *Reynolds*.

### (2) Specificity Requirement

■ Aside from claiming that the Attorney General's Declaration fails to satisfy the personal consideration requirement of *Reynolds*, the plaintiff also asserts that the Declaration fails to satisfy *Reynolds* specificity requirements so as to allow meaningful judicial review. Pl.'s Opp'n at 11–16. This challenge presents a more difficult question as the Attorney General's unclassified Declaration does not specify in any detail the harm that might occur to national security should this information be disclosed. The Attorney General's Declaration simply states:

> Based on my personal consideration of the matter, I have concluded that further disclosure of the information underlying this case, including the nature of the duties of plaintiff or the other contract translators at issue in this case reasonably could be expected to cause serious damage to the national security

---

5. The plaintiff seems to suggest that the Attorney General must read her complaint prior to invoking the state secrets privilege. Opp'n at 9–10. There is, however, no case authority cited that would support such a position.

Here, the Attorney General was informed of the plaintiff's claims and personally considered information, including a classified declaration, that led him to conclude that the state secrets privilege should be invoked.

interests of the United States. Any further elaboration concerning this matter on the public record would reveal information that could cause the very harms my assertion of the state secrets privilege is intended to prevent.

Ashcroft Decl. ¶ 5. In *Linder v. Department of Defense*, 133 F.3d 17 (D.C.Cir. 1998), the District of Columbia Circuit stated that judicial review of the invocation of the state secrets privilege involves either review of

> some form of detailed public explanation of 'the kinds of injury to national security [they] seek[ ] to avoid and the reason those harms would result from revelation of the requested information,' or indicated 'why such an explanation would itself endanger national security.' Or, if necessary, the court would have had to examine the privileged materials *in camera* to satisfy itself that invocation of the privilege was proper.

*Id.* at 23 (quoting *Ellsberg*, 709 F.2d at 63–64). The *Linder* Court based its assessment on the Circuit's observations in *Ellsberg*. *Id.* There, the District of Columbia Circuit thoroughly discussed the specificity requirements of the state secrets privilege. The *Ellsberg* Court stated that

> in situations in which close examination of the government's assertions is warranted, the trial judge should insist (1) that the formal claim of privilege be made on the public record and (2) that the government either (a) publicly explain in detail the kinds of injury to national security it seeks to avoid and the reason those harms would result from revelation of the requested information or (b) indicate why such an explanation would itself endanger national security. We wish to make clear the limitations of our ruling: The government's public statement need be no

more (and no less) specific than is practicable under the circumstances.

709 F.2d at 63–64 (footnote omitted). Here, the Attorney General represented that his "classified declaration, along with the classified Gebhardt Declaration, [were] . . . available . . . for *in camera, ex parte* review to provide a more detailed explanation of the information at issue and the harms to national security that would result from its disclosure." Ashcroft Decl. ¶ 5. Thus, this situation called for the Court "to examine the privileged materials *in camera* to satisfy itself that invocation of the privilege was proper." *Linder*, 133 F.3d at 23. This Court therefore reviewed several classified declarations, including the declarations of Attorney General Ashcroft and FBI Deputy Director Gebhardt, which specifically detail the "reasonable danger" that revelation of classified information would have on both "intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *Ellsberg*, 709 F.2d at 57. After undertaking this review, the Court is satisfied that the classified declarations contain a sufficient degree of specificity to establish that the invocation of the state secrets privilege is proper. However, this Court is "unable publicly to explain [its] conclusion in any more detail. It is one of the unfortunate features of this area of the law that open discussion of how the general principles apply to particular facts is impossible." *Id.* at 59 n. 41 (citation omitted).

That privileged information has already been released to the press or provided in briefings to Congress does not alter the Court's conclusion. In *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C.Cir.1990), the District of Columbia Circuit stated that "the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations."

*Id.* at 766. In the plaintiff's FOIA case, the court addressed the same contention raised by the plaintiff in her efforts to gain the release of documents protected by the government's invocation of the national security exemption from the FOIA's mandatory disclosure rules. *Edmonds,* 272 F.Supp.2d at 48–49. Judge Huvelle found that

> a comparison of the information contained in the documents withheld … with the quoted statements in the media which have been attributed to the government, the information that is being withheld is not identical to the information in the public domain. Rather, the withheld information is far more detailed and its release could provide a composite picture, or at least additional information, that would be harmful to national security. Moreover, since the statements in the press were made by anonymous sources, even documents containing identical information may properly be withheld because 'release would amount to official confirmation or acknowledgment of their accuracy.'

*Id.* at 49 (quoting *Washington Post v. United States Dep't of Def.,* 766 F.Supp. 1, 9 (D.D.C.1991) (Judge Huvelle noted that *Washington Post* stands for the proposition that "information in the public domain may be withheld where withheld information is more detailed and release of that information poses a threat to national security; even if the information is exactly the same, it may be withheld if revealing the context in which the information is discussed would itself disclose additional information that would be harmful to national security; or if release of the withheld information would amount to official confirmation or acknowledgment of its accuracy")). The court went on to note that "the fact that the FBI provided information to members of Congress regarding plaintiff's whistleblower allegations does not deprive defendant of the right to classify the information …, for disclosure of information to a congressional committee does not constitute a waiver." *Id.* (citing *Fitzgibbon,* 911 F.2d at 766 ("government transmission of 'an official document to a congressional committee does not mean that the Agency can thereby automatically be forced to release any number of other documents' ") (other citations omitted)). This Court sees no reason to come to a different conclusion in this case.

**(B)** *If the Government has Properly Invoked the State Secrets Privilege, Should this Case be Dismissed?*

█ Once the government has properly invoked the state secrets privilege, the inquiry shifts to the application of the privilege to the case at hand. As this Court stated above, it must "uphold the privilege if the government shows that 'the information poses a *reasonable danger* to secrets of state.'" *In re United States,* 872 F.2d at 475 (internal quotation marks and citations omitted) (emphasis added); *see Ellsberg,* 709 F.2d at 58 ("the government need not demonstrate that injury to the national interest will inevitably result from disclosure; *a showing of 'reasonable danger' that harm will ensue is sufficient.*") (footnote omitted) (emphasis added). In undertaking this analysis, not only must this Court "accord[ ] the utmost deference to the executive's expertise in assessing privilege upon grounds of military or diplomatic security," *id.* (internal quotation marks and citations omitted), but it must be mindful, especially at a time when our nation's security is threatened by acts of terrorism, that

> [i]t requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the manage-

ment of a cloak and dagger affair. Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate.

*Id.* (quoting *Halkin,* 598 F.2d at 8).

■ It is generally understood that "[t]he application of the state secrets privilege can ... have three effects." *Doe v. Tenet,* 329 F.3d 1135, 1149 (9th Cir.2003) (quoting *Kasza,* 133 F.3d at 1166). As the Ninth Circuit explained:

> First, by invoking the privilege over particular evidence, the evidence is completely removed from the case. The plaintiff's case then goes forward based on evidence not covered by the privilege. If, after further proceedings, the plaintiff cannot prove the prima facie elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it would with any plaintiff who cannot prove her case.
>
> Alternatively, if the privilege deprives the *defendant* of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant.
>
> Finally, notwithstanding the plaintiff's ability to produce nonprivileged evidence, if the very subject matter of the action is a state secret, then the court should dismiss the plaintiff's action based solely on the invocation of the state secrets privilege. While dismissal of an action based on the state secrets privilege is harsh, the results are harsh in either direction and the state secrets doctrine finds the greater public good— ultimately the less harsh remedy—to be dismissal.

*Kasza,* 133 F.3d at 1166–67 (internal quotation marks and citations omitted); *see Zuckerbraun v. Gen. Dynamics Corp.,* 935

F.2d 544, 547 (2d Cir.1991) ("In some cases, the effect of the invocation of the privilege may be so drastic as to require dismissal. Thus, if proper assertion of the privilege precludes access to evidence necessary for the plaintiff to state a prima facie claim, dismissal is appropriate. Similarly, it has been held that if the court determines that the privilege so hampers the defendant in establishing a valid defense that the trier is likely to reach an erroneous conclusion, then dismissal is also proper.") (citations omitted); *In re United States,* 872 F.2d at 476 ("The effect of a valid claim of privilege on the outcome of a particular case depends on the purpose that the privileged information would have served. If the information is essential to establishing plaintiff's prima facie case, dismissal is appropriate. If, on the other hand, the information related not to the plaintiff's claim, but rather to the defense, summary judgment against the plaintiff is proper if the district court decides that the privileged information, if available to the defendant, would establish a valid defense to the claim.") (citations omitted).

■ In undertaking its role to "critically ... examine instances of [the] invocation" of the state secrets privilege in this case, the Court is mindful that "the privilege may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter." *Ellsberg,* 709 F.2d at 57 (footnote omitted). For this reason, following the Court's initial review of the classified declarations submitted by the government, the Court issued an Order on June 3, 2004, requiring the government to specifically detail why it is not possible to disentangle sensitive information from nonsensitive information to permit the plaintiff's claims to go forward and

for the government to defend against these claims. June 3, 2004 Order. The government subsequently submitted an additional classified declaration specifically addressing in great detail why each of the plaintiff's claims is unable to go forward without the release of privileged information. Upon conducting a thorough review of the several classified declarations, the Court finds that the plaintiff is not only unable to prove the prima facie elements of each of her claims without the disclosure of privileged information, but that the defendants are unable to assert valid defenses to her claims without such disclosures.

**(1) Plaintiff's First Amendment Claim**

■ The plaintiff's complaint states that she "engaged in activity protected by the First Amendment to the U.S. Constitution by reporting serious problems within the FBI translator program which has a direct and significant bearing on matters of widespread public concern." Compl. ¶ 51. The plaintiff asserts that she was terminated from the FBI for engaging in this protected activity. *Id.* ¶ 52.

While the speech of public employees "enjoys considerable First Amendment protection[,]" to assert a viable First Amendment claim, the plaintiff would have to satisfy a four-prong test. *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C.Cir.1998) (citations omitted). The four-part test, as articulated by the District of Columbia Circuit, is as follows:

First, the public employee must have been speaking on a matter of public concern. If the speech is not of public concern, it is unnecessary to scrutinize the basis for the adverse action absent the most unusual circumstances. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees without disruption, outweighs the employee's interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what the employee has to say[.] Third, the employee mush show that her speech was a substantial or motivating factor in prompting the retaliatory or punitive act of which she complains. And finally, the employer should have an opportunity to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.

*Id.* (internal quotation marks and citations omitted). The government asserts, and this Court must agree, that any effort by the plaintiff to establish these elements or by the defendants to rebut them would risk disclosure of privileged information. Def.'s Mem. at 10. This is because not only is the nature of the plaintiff's employment the subject of the state secrets privilege, but so are the events surrounding her termination. Thus, the plaintiff could not establish, nor could the defendants rebut, whether the plaintiff's speech during the course of her employment was on a matter of public concern, whether a balancing could be undertaken of the government's interest versus the plaintiff's interest in disclosure of this information, whether the plaintiff's speech was the motivating fact for her termination, or whether there were other reasons for her termination, without revealing privileged information. Accordingly, this Court must find that the plaintiff's First Amendment claim cannot be pursued.

**(2) Plaintiff's Fifth Amendment Claim**

■ The plaintiff also asserts that the "[d]efendants have violated [p]laintiff's right to procedural due process and her due process liberty interest pursuant to

the Fifth Amendment to the U.S. Constitution as a result of [d]efendants' termination of [p]laintiff's employment and [d]efendants' interference with [p]laintiff's opportunity to obtain future employment in her chosen career." Compl. ¶ 63. The plaintiff alleges that the defendants accomplished this by "intentionally and willfully releas[ing] derogatory and confidential information about [p]laintiff and ma[king] defamatory statements about [p]laintiff in addition to discharging her from her duties in violation of [her] right to due process." *Id.* ¶ 64.

▬▬▬ It is well understood that a non-tenured government employee[6] does not have a property interest in her job. *Lyons v. Barrett,* 851 F.2d 406, 410 (D.C.Cir.1988). However, "[t]he Supreme Court has long recognized that a liberty interest may be implicated when an attack is made upon an individual's 'good name, reputation, honor, or integrity....'" *Id.* (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). When such a claim is made, "the appropriate remedy is a hearing in which the dismissed employee is given an opportunity to refute the charges and clear [her] name." *Id.* (citing *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1112 (D.C.Cir.1985)). However, in this case it is impossible for the parties to participate in a trial in order to give the plaintiff an opportunity to refute the allegations made about her because the nature of the charges allegedly made by the anonymous government official to the press is comprised of privileged information. And, for the same reasons the plaintiff's First Amendment claim cannot be pursued, this claim cannot proceed since the defendant will be unable to adequately rebut the plaintiff's assertions without revealing privileged information. As the government observed in its motion to dismiss, the "litigation over the truth of [purported defamatory] statements [made by the FBI] would again necessarily implicate the classified nature of plaintiff's duties with the FBI and the substance of what happened in the underlying dispute." Def.'s Mem. at 13. Accordingly, this Court must also find that the plaintiff's Fifth Amendment claim cannot go forward.

### (3) Plaintiff's Privacy Act Claims

▬▬▬ Finally, with respect to the plaintiff's Privacy Act claims, the Court also finds that the plaintiff is unable to establish these claims, nor will the defendants be able to rebut her allegations without the disclosure of privileged information. The heart of the plaintiff's Privacy Act claims is that "[d]efendants DOJ and FBI, through their officers, employees, agents, and representatives, commenced intentionally and/or willfully disclosing and releasing to unauthorized persons the contents of records maintained by [d]efendants in one or more systems of records pertaining to [p]laintiff['s]" employment, termination and security review. Compl. ¶ 37. The government asserts that the "plaintiff's Privacy Act claims would implicate the central issues that consume the whole of this litigation—the duties of plaintiff and her co-workers, the plaintiff's underlying allegations, and the facts, documents, and evidence in connection therewith." Def.'s Mem. at 15. In order to litigate plaintiff's Privacy Act claims, the government points out that "it would be necessary to probe the content of what may be contained in a

---

**6.** A non-tenured government employee is an individual that has a "legitimate claim of entitlement to continued employment absent sufficient cause." *Lyons v. Barrett,* 851 F.2d 406, 410 (D.C.Cir.1988) (internal quotation marks and citations omitted) (quoting *Perry v. Sindermann,* 408 U.S. 593, 602–03, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).

system of records and who had access to it, and for an accuracy claim, the substantive content of information in a system of records would be directly at issue." *Id.* Aside from the disclosure of these privileged documents that comprise the system of records, because the plaintiff is unaware of who released this information, deposition testimony would have to be taken. However, as the nature of the plaintiff's employment is privileged information, "identifying the individuals involved, where they work, what they do, their personal background, and their expertise" is not possible. *Id.* Furthermore, because the circumstances surrounding the underlying allegations are privileged, even if the plaintiff could depose the individuals who could provide information about the events, such inquiries are also impossible. And, in an action for damages under the Privacy Act, the plaintiff would have to show that the violation was so " 'patently egregious and unlawful' that anyone undertaking the conduct should have known it 'unlawful.' " *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987) (citations omitted). Without access to the information covered by the privilege or the ability to depose witnesses who may have knowledge of the events, the Court is unable to fathom how the plaintiff could prove that the defendants acted in a "patently egregious and unlawful" manner. Accordingly, because the Court finds that documents related to the plaintiff's employment, termination and security review that comprise the system of records are privileged, and because the plaintiff would be unable to depose witnesses whose identities are privileged or to otherwise identify through discovery the individual or individuals who purportedly released the privileged information, the plaintiff is also unable to proceed with her Privacy Act claims.

### III. *Conclusion*

The District of Columbia Circuit has stated that "[d]ismissal of a suit, and the consequent denial of a forum without giving the plaintiff her day in court ... is indeed draconian. '[D]enial of the forum provided under the Constitution for the resolution of disputes, U.S. Const. art. III, § 2, is a drastic remedy that has rarely been invoked.' " *In re United States,* 872 F.2d at 477 (quoting *Fitzgerald v. Penthouse Int'l, Ltd.,* 776 F.2d 1236, 1242 (4th Cir.1985)). Mindful of the need for virtual unfettered access to the judicial process in a governmental system integrally linked to the rule of law, the Court nonetheless concludes that the government has properly invoked the state secrets privilege, as the Attorney General, after actual personal consideration, made a formal claim of the privilege in both an unclassified declaration and a classified declaration that contains the requisite specificity needed to properly invoke the privilege. The Court's review of the classified declarations submitted by the government adequately demonstrates that the information that would have to be revealed for this case to be litigated poses a "reasonable danger to secrets of state." *Id.* at 475 (citation omitted). And, after an *ex parte, in camera* review of the additional information provided to the Court pursuant to its June 3, 2004 Order, the Court is satisfied that it is not possible for "sensitive information [to] be disentangled from nonsensitive information to allow for the release of the latter." *Ellsberg,* 709 F.2d at 57 (footnote omitted). Accordingly, because the Court finds that the plaintiff is unable to establish her First Amendment, Fifth Amendment and Privacy Act claims without the disclosure of privileged information, nor would the defendants be able to defend against these claims without the same disclosures, the

**82**

plaintiff's case must be dismissed,[7] albeit with great consternation, in the interests of national security.[8]

**SO ORDERED** this 6th day of July, 2004.

---

**7.** In concluding that the state secrets privilege is applicable to this case, the Court finds that dismissal of this suit is the necessary result. While the Court had contemplated alternative remedies short of dismissal, for example staying the case to await the possibility that one day the privileged information will no longer constitute a state secret, it must conclude that there are no viable alternatives. This is due not only to the nature of the information, but also because the imminent threat of terrorism will not be eliminated anytime in the foreseeable future, but is an endeavor that will consume our nation's attention indefinitely. Moreover, with the case in this posture, the plaintiff will be able to immediately seek ap-

---

pellate review, rather than having these proceedings stayed, which would delay indefinitely the plaintiff's ability to seek appellate relief.

**8.** An Order consistent with the Court's ruling accompanies this Memorandum Opinion.